UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBIN L. ANDERSON, | ) | CASE NO.  5:08cv2312 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| KENT STATE UNIVERSITY, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | [Resolving Doc. 35] |
| | ) | |
| | ) | |

This matter comes before the Court on Defendants' motion for summary judgment on all of Plaintiff's claims. The matter has been fully briefed and is ripe for disposition.  For the reasons set forth herein, Defendants' motion is GRANTED.

## I.  BACKGROUND

Plaintiff Robin Anderson ("Plaintiff") is a former employee of Kent State University ("KSU"), a state university. When employed by KSU as a carpenter, Plaintiff worked in the Campus Environment and Operations department ("CE&O"). For several years during his employment, he used his KSU email account to send what he now characterizes as "robust and irreverent" emails expressing his displeasure with his employer and his employment. (Doc. 39 at 4.) KSU found that the emails were offensive and threatening and amounted to a failure of good behavior. After repeated warnings and discipline, KSU terminated his employment.

Plaintiff now brings this action under 28 U.S.C. § 1983 for monetary and equitable relief, claiming that his emails were an exercise of his First Amendment rights

and that his termination was retaliatory and a violation of those rights. Plaintiff names as defendants KSU and several KSU employees, namely Alvin Evans, the Associate Vice President for Human Resources; Jerusha Kelson, the Manager of Labor Relations; Robert Misbrener, Project Manager in the Office of the University Architect[1]; Michael McDonald, the Director of CE&O at all times relevant to this litigation; and Martin Cofojohn, the Structures Superintendent. Plaintiff seeks monetary damages from the Individual Defendants in their individual capacities. He seeks equitable relief – including lost pay and benefits – from KSU and from the Individual Defendants in their official capacities.[2]

Defendants have moved for summary judgment on Plaintiff's only claim on the basis that Plaintiff cannot establish a prima facie case of retaliatory discharge in violation of the First Amendment.

### A. FACTUAL HISTORY

Beginning as early as February 2004, Plaintiff was using his campus email account to send emails to members of the KSU community about issues of interest to him.[3] These emails increased in frequency and changed in tone around July 2006.

A memorandum of a "verbal warning" in Plaintiff's file reflects that sometime around July 26, 2006, Plaintiff was counseled by his supervisors, Martin Cofojohn and Bob Misbrener, regarding an email he had sent to a co-worker which the co-worker found offensive. (Doc. 29-21.) According to the memorandum, Plaintiff had

---

[1] Misbrener achieved this office in 2008. During the times relevant to this litigation, Misbrener was the Associate Mechanical Engineer (1999-2005) and the Associate Director of CE&O (2005-2008).

[2] Plaintiff's Amended Complaint does not make this clear. He clarifies the issue in his response in opposition to Defendants' motion for summary judgment.

[3] The emails offered as exhibits to Plaintiff's deposition are quite numerous. The Court has highlighted in its reiteration of the factual background of this matter only the emails it finds particularly relevant.

also sent an email to Cofojohn in which he criticized Cofojohn's job performance. *Id.* Cofojohn urged Plaintiff to "improve in this area." *Id.*

Plaintiff sent an email on July 30, 2006, to Cofojohn, Misbrener and others, opening by calling it a "man-to-man letter" and proceeding to define the terms libel and slander, labels that his supervisors had apparently attached to his earlier emails during the meeting referenced in the memorandum of the verbal warning. (Doc. 29-13.) In this email, Plaintiff called his supervisors "buttercups" and "weenies." *Id.*

In a second August 1, 2006 memorandum (Doc. 29-22), entitled "Insubordination, Creating a Hostile Work Place, and Improper Language," Cofojohn issued a written warning regarding a public confrontation between himself and Plaintiff. As documented by Plaintiff himself in an August 6, 2006 email (Doc. 29-14), when Cofojohn and Plaintiff disagreed about an issue within the context of Plaintiff's employment, Plaintiff told Cofojohn three times that he was "full of shit" before he completed the task without further incident. Plaintiff sent his August 6 account of the incident not only to his supervisors, but also to a large number of people in the KSU community, including the board of trustees, KSU President Lester Lefton ("Lefton"), and Carolyn Pizzuto ("Pizzuto"), the vice president of human resources. He referred to the incident as a "pissing contest," recounting the events in some detail.

Beginning August 16, 2006, Plaintiff sent multiple emails to many of the same recipients (including Lefton and Pizzuto) in which he again generously employed name-calling, sarcasm and insults. (Docs. 29-16, 29-17, 29-18, 29-19, 29-20.) He called his supervisors "stuporvisors" and "stupidintendents," as well as "buttercups," "sweetpeas," "cupcakes," and "dear-hearts." He asked his supervisor "just when the

3

HELL" he intended to retire, noting "It can't be too soon for me, don't you know!!!" (Doc. 29-16) (emphasis in original.) The topics of these emails ranged from job postings at other institutions to the number of supervisors in the grounds department to management's performance on training exercises.

The barrage of emails continued throughout August. On August 17, 2006, Plaintiff sent an email to Lefton, carbon copying Mike McDonald, among others. (Doc. 29-25.) He complained that the disciplinary process had been misused against him and, after reminding them of his First Amendment rights, concluded "Your [sic] messing with a man who uses a hammer for a liveing [sic], buttercup!" *Id.*

In another email sent the same day to Lefton and many others, Plaintiff informed the recipients about "military doctrine" and the definition of insubordination. (Doc. 29-27.) Having compared civilians with military personnel and contrasted their relative abilities to comprehend the import of authority and the gravity of insubordination, he concluded,

> You "gentlemen" will not snap your fingers and tell me to "jump" and, even if you dared do so, sirs, you will never obtain a response such as "Yes sir…how high!" The mission of Kent State University is not worthy of such doctrine or allegiance and you, sirs, have most definitely not earned it!

*Id.*

Plaintiff underwent a pre-disciplinary hearing on September 25, 2006, on a charge of failure of good behavior. (Doc. 29-35.) He argued to those assembled that his emails were not inappropriate and that most reasonable people did not consider them to be a threat. His supervisors, on the other hand, concluded that his emails to Mike McDonald were threatening and contributed to a hostile work environment, and that

4

Plaintiff's behavior constituted a failure of good behavior. He was suspended for 10 days without pay, which was set aside because he accepted a referral to KSU's employee assistance program, IMPACT, for counseling. The summary concluded that "[i]n the event that Mr. Anderson continues to send threatening e-mails, it is recommended that his employment be terminated." (Doc. 29-35 at 2.) Alvin Evans sent Plaintiff a memo dated October 20, 2006, outlining the topics discussed at the hearing and reminding Plaintiff that further failure of good behavior or continued name-calling and threatening remarks would result in "further disciplinary action, up to and including termination of employment." (Doc. 29-37.) Plaintiff confirmed in his deposition that he had received Evans's memo. (Doc. 28 at 36.)

In an email dated October 20, 2006 (again to Lefton and the board of trustees, among others), Plaintiff effectively taunted his supervisors with the threat of grievance proceedings, referring to them as "weenies" and "prudes." (Doc. 29-38.) He further informed his supervisors that he would be wearing a shirt in support of breast cancer awareness on October 26, 2006, and that he would wear his University of Akron sweatshirt over his uniform shirt "whenever [he] desire[d] [. . . ] unless [they] show[ed] him] some 'flack from the University Administration' otherwise." *Id.* The subject line of his email read, "[a]nd so the gauntlet is thrown down." *Id.*

On October 23, 2006, Mike McDonald sent an email to the CE&O employees in which he told them it was not acceptable to wear clothing "over, or in lieu of, their uniform in order to promote causes, charitable or otherwise[.]" (Doc. 29-39.) However, Plaintiff did not accept or follow this directive. The next item attached as an exhibit to Plaintiff's deposition is a written warning from McDonald dated October 26,

2006, indicating that Plaintiff had worn a pink breast cancer awareness ball cap in violation of the October 23 instruction, and that further failure to meet uniform directives would make him "subject to disciplinary action, up to and including termination." (Doc. 29-40.)

On October 26, 2006, Plaintiff sent an email to Evans complaining that the disposition of his grievance proceeding was late. (Doc. 29-43.) In that email, Plaintiff repeatedly called Evans—an African-American—"son" and used the expression "[t]alk about the pot calling the kettle black." *Id.* He stated that Evans was not entitled to respect unless he performed better and closed his email by saying "with absolutely no respect what-so-ever." *Id.*

Plaintiff then sent an email on October 30, 2006, to Evans, Lefton, the Board of Trustees, Pizzuto and others, in which he defined the word "disparage" and complained about Evans's disposition after the pre-disciplinary hearing. (Doc. 29-44.) He again called Evans "son" repeatedly and suggested that Evans had no idea what "disparagement" was and had used the word in the disposition only because it sounded "neat." *Id.*

The emails to the campus community about issues having nothing to do with campus life or anything other than Plaintiff's personal complaints continued, the next notable one being sent on August 29, 2007. Plaintiff sent an email to Lefton, carbon copying others, in which he stated that Lefton was overpaid. (Doc. 29-63.) He also made reference to Lefton's cat as a piece of "alligator bait," and asked, "You do keep it in the house, don't you?" *Id.* After commenting on KSU's rankings, Plaintiff concluded with, "The gauntlet has been thrown, bud, and you've already stated you don't have the

6

kahoonies to pick it up . . . sigh." *Id.* Plaintiff again made reference to Lefton's cat in an email dated September 3, 2007. (Doc. 29-64.)

Plaintiff's emails accelerated in frequency and increased in vitriol when Lefton proposed mandating that non-bargaining unit employees use four of their vacation days during the winter break.[4] At the beginning of October 2007, Plaintiff began sending emails nearly every day. He continued to send the emails to Lefton and Pizzuto (among others[5]) and would refer to them as "Loot" and "Queenie," respectively. *See, e.g.,* Docs. 29-72, 29-73, 29-75, 29-76, 29-78. In one of the emails, he concluded that "there's always a price to be paid for getting in a conflict with some sob…grabbing each other by the gonads…and sweating out who will let go first, eh?" (Doc. 29-75.) In other emails, he called Lefton a "thieving prick" and an "elitist prick." (Doc. 29-80, 29-83.) In yet another, he called Lefton, who is Jewish, "Jasper," a term used by some as a slur against Jewish people.[6] (Doc. 29-112; *see also* Doc. 30 at 44.) Further, he facetiously asked Lefton if he could "have a bagel" with his "donation" of vacation days. (Doc. 29-78.)

In late October 2007, another pre-disciplinary hearing was held, the result of which was that Plaintiff was terminated, effective November 26, 2007. At a "post pre-disciplinary hearing" held November 26, 2007, Plaintiff was offered a Last Chance Agreement ("LCA") that would have required him to acknowledge the inappropriateness of his emails, to cease disrespectful and offensive behavior, to participate in IMPACT, and to waive all grievance proceedings, among other things. (Doc. 29-97.) Plaintiff

---

[4] Curiously, Plaintiff sent repeated emails regarding the policy even though the policy did not apply to him.
[5] Plaintiff admitted several times in his deposition that he did not know how many recipients were included in his emails because they might have been blind carbon copied or cut off of the recipient address block if it was too long. *See, e.g.,* Doc. 28 at 49, 50.
[6] Plaintiff contended in his deposition that he was unaware of this meaning and did not intend it. (Doc. 29 at 99-100.)

refused to sign the LCA and his termination became effective that day. He grieved the termination through the arbitration stage.  The arbitrator denied his claim.

### B. EVIDENCE UNDER CONSIDERATION

Plaintiff believes that the Court, in ruling on this motion, should consider only those emails considered during his arbitration proceedings, namely Arbitration Exhibits O-Y. (Attachments 13, 15-20, 42-44 and 46 to Doc. 34.) He asserts in his response to Defendants' motion that those emails, sent during 2007, formed the basis of his discharge, and that Kelson was unable to identify during her deposition any other emails that she reviewed that informed her recommendation to terminate Plaintiff. He further implies that, because the late 2006 discipline dealt with emails he had sent to the KSU community up to that point, those emails were not reviewed by KSU at the time of his termination and are not reviewable now because Plaintiff completed the IMPACT counseling mandated at the time. *See* Doc. 39 at 3.

Based upon the Court's review of the record, Plaintiff's assertion that the 2007 emails formed the sole basis for his termination is unfounded. Kelson states in her deposition that she reviewed not only those emails that were sent directly to her, but also those forwarded to her by McDonald, Misbrener and Cofojohn, and that this review consisted of over one hundred emails. (Doc. 30 at 40-41.) Kelson's memorandum sent October 10, 2007, recommending Plaintiff's termination clearly references the emails for which Plaintiff was disciplined in 2006. Moreover, any implication that Plaintiff's emails prior to 2007 should not be reviewed is unsupportable. All of Plaintiff's emails are part of a progressive disciplinary scheme and form the basis for warnings that, should he fail to conform his actions to KSU's standards in future, he faced further discipline up to and

including termination. For these reasons, the Court will consider the entire record of emails sent by Plaintiff, all of which are exhibits to Plaintiff's deposition and are identified by him therein.

## II. LEGAL STANDARD

Effective December 1, 2010,[7] Rule 56 of the Federal Rules of Civil Procedure, addressing Summary Judgment, provides in relevant part as follows:

(a)  **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

[ * * * ]

(c)  **Procedures.**

(1)  *Supporting Factual Positions*. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an

---

[7] All of the briefs relating to the instant motion were filed before the effective date of the new Rule 56. However, that should have no bearing on resolution of this motion because the Committee Notes accompanying the new rule make clear that it was "revised to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts." The fundamental standard for deciding these motions "remains unchanged." There still must be "no genuine dispute as to any material fact" and the movant must be "entitled to judgment as a matter of law." As noted by the Committee: "The amendment will not affect the continuing development of the decisional law construing and applying these phrases."

> adverse party cannot produce admissible evidence
> to support the fact.

[ * * * ]

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (*citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to

point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## III. DISCUSSION

As an initial matter, the Court notes that, because KSU is a public university, state action is present. *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179 (1988) ("A state university without question is a state actor.").

### A.  Retaliatory Discharge

In order for a public employee to make out a claim for retaliatory discharge based on protected speech, he must satisfy three elements, as follows:

> 1) the speech involved a matter of public concern; 2) the interest of the employee as a citizen, in commenting upon matters of public concern, outweighs the employer's interest in promoting the efficiency of the public services it performs through its employees; and 3) the speech was a substantial or motivating factor in the denial of the benefit that was sought.

*Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir. 2000) (internal citations and quotations omitted); *see also Connick v. Myers*, 461 U.S. 138, 143 (1983); *Mt. Healthy City Sch. Dist Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The Supreme Court held in *Connick* that the balancing test in the second element above, which was first set forth by that Court in *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968), is only required if a public employee's statements can "be fairly characterized as constituting speech on a matter of public concern."  *Connick*, 461 U.S. at 146.

11

Plaintiff contends that he was discharged as a result of speech involving a matter of public concern based upon the emails he sent to members of the KSU community.  Defendants counter that his emails did not contain any protected speech, and that Plaintiff therefore cannot satisfy the prongs of the elements of a First Amendment retaliation claim.

### 1.  Matter of Public Concern

A plaintiff must first demonstrate that the speech in which he was engaged involved a matter of public concern. *Connick*, 461 U.S. at 142. This is a question of law.[8] *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 180 (6th Cir. 2008). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48.

Courts have repeatedly held that speech on issues of corruption or unlawful practices in public offices constitutes a matter of public concern. *See See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) (employee's discussion with the FBI about issues of corruption in police department constituted speech on a matter of public concern); *Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 46 (2d Cir.1983) ("An allegation of corrupt and wasteful practices at a large municipal hospital, made to the city official empowered to investigate such charges, obviously involves a matter of public concern."); *Leary v. Daeschner*, 349 F.3d 888, 899 (6th Cir. 2003) ("[C]omments regarding the legality of educational programs, the discipline of students, and the

---

[8] "Whether the speech at issue involves a matter of public concern is a question of law for the court, although there may be some factual questions for a jury if it is disputed whether the expression occurred or what words were specifically stated." *Hughes*, 542 F.3d at 180 (citing *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004)).  No such questions arise here, as all of Plaintiff's statements were made via emails that he has identified during his deposition as being those he composed and sent.

violation of school procedures constitute protected speech because some portion of the speech touches on a matter of public concern") (quotation and citation omitted); *Banks v. Wolfe County Bd. of Educ.*, 330 F.3d 888, 897 (6th Cir. 2003) ("[T]he point of the protection afforded public employees is to allow public employees a voice on issues actually affecting and interesting the community at large," such as a public school's misuse of funds or hiring of unqualified teachers.). While the distinction between matters of private and public concern may be a difficult one to make, the Supreme Court has stated that

> when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147.

Plaintiff, having limited his review of the evidence to the 2007 emails he thought were relevant to this action, identifies the following topics as those on which he offered what he contends are constitutionally protected opinions: Lefton's vacation policy (Docs. 34-13, 34-15, 34-16, 34-17, 34-18, 34-20), the use of taxpayer funds for management seminars (Doc. 34-19), and various university funding issues (Docs. 34-42, 34-43, 34-44)[9]. The Court will limit itself to consideration of the emails Plaintiff has identified for purposes of this issue only, and will consider the emails on each of these topics in turn. Suffice it to say, however, that given the content, form and context of Plaintiff's emails on the whole, the statements contained in the emails specified by

---

[9] Plaintiff also offers an email in which he objects that he was not afforded due process prior to his disciplinary proceedings. (Doc. 34-46.) The Court finds nothing in this email beyond a purely personal grievance against KSU.  It adds nothing to Plaintiff's argument that his communications dealt with matters of public concern.

13

Plaintiff have very little, if anything, to do with matters of public concern, but, rather, appear to service the primary purpose of denigrating and insulting those being referenced.

### a. Vacation policy emails

Plaintiff contends that each of the vacation policy emails was concerned with matters of public interest in that each commented upon a government policy as promulgated by KSU, a state university. This, he asserts, should afford them protection under the First Amendment even if he did not disseminate them outside the KSU community. The Court finds Defendants' response apt: were commentary upon the policies of any governmental agent the only requirement for the protection of speech under the First Amendment, all speech of public employees regarding their employers' policies would be arguably protected. *See Connick*, 461 U.S. at 149.

The Court finds that the emails identified by Plaintiff do not address matters of public concern. In this instance, Plaintiff had landed upon a policy of his government employer that angered him and he informed the KSU community about his complaints, acknowledging that the policy was not illegal. *See* Doc. 34-20. The only points on which Plaintiff's emails were arguably instructive were the following: that Lefton was proposing a mandated use of four vacation days during the Christmas holiday season; that such a mandate would limit employees' choices about when to take their vacation time, which he contended would amount to a taking; and that applying for unemployment benefits would not help employees because unemployment required a one-week waiting period before benefits were available. In addition, he posited that those from non-Christian faiths might prefer to work through the Christian holiday season,

suggesting some form of religious discrimination. (Doc. 34-13.) The remaining content of his emails amounted to unrelated insults and name-calling.

Plaintiff's emails offered little to the community—either the KSU community or the broader populace—about an issue with which it was concerned. The little actual information the emails contained was largely incorrect.  For instance, his suggestion that the policy amounted to a taking is unsupportable, as employees continued to have vacation days, albeit some of them were assigned to a particular time of year. Any additional information about unemployment benefits served only to reinforce the fact that the policy was not illegal. Furthermore, his reference to religious observances (or non-observances) of the Christmas season has nothing to do with a religious freedom claim.

Given the limited factual content of Plaintiff's emails, it is evident that they did little to inform the community of anything more than the fact that Plaintiff had an employment grievance. In addition to content, however, the Court must also consider both the context and the form of Plaintiff's speech. As for context, the record does not reflect active public debate on the issue of KSU's vacation policy. What it does reflect is a collection of emails from Plaintiff dating back to 2006 (and before) sent to many members of the KSU community chosen by Plaintiff for no other reason than the ability to do so[10], a large number of which exuded vitriol and indulged in sarcastic name-calling on issues of personal concern only to him, and which were distributed to members of the KSU community without discretion. The context provided by these emails does not support any claim by Plaintiff that he routinely spoke on topics of interest to the public.

_____

[10] Plaintiff admitted in his deposition that he had sent emails to some recipients "because he could." (Doc. 28 at 21.)

Emailing large numbers of people who are unfamiliar with the background of his complaints and did not solicit his opinion about issues in which they are not interested does not constitute participation in public discourse. Instead, it simply demonstrates Plaintiff's progressive and continual refusal to comply with his supervisors' admonishments that failure to conform his behavior to KSU's requirements would result in further discipline up to and including termination. *See e.g.* Docs. 29-21, 29-22, 29-35.

Finally, the courts must consider the form of the speech at issue. In this case, Plaintiff's speech consists of caustic emails to many people who had never met Plaintiff and who had not solicited his opinion, that seem composed and distributed for the purpose of calling out, humiliating or insulting his supervisors and the administration of KSU. This accomplishes nothing more than to fuel a dispute between Plaintiff and the supervisors and administrators with whom he was already unhappy.

Plaintiff's personal opinion about Lefton's vacation policy does not rise to the level of a public concern. Plaintiff has not demonstrated governmental corruption, financial mismanagement, illegal hiring practices, or other breaches of the public trust, as courts have required of speech that constitutes a matter of public concern. He has simply provided his reasons for disliking the policy in a form that is patently antagonistic.

### b. Management seminar email

Plaintiff next points to his commentary on a management retreat as the second email topic that he believes ought to be protected. This email reads in its entirety as follows: "A report of management-weenies going through a rough & tough 'boot camp'? I'm impressed . . . yeah, right. Hope it wasn't on the taxpayers' dime." (Doc. 29-79.)

16

While Plaintiff would like the Court to conclude from this email that he is informing the public about the possible mismanagement of taxpayers' money, the Court is not so inclined. Plaintiff has provided no content in this email. What he has provided is another instance of his derisive attitude toward so-called "management-weenies." It fits directly into the context of his prior emails and serves only to further his airing his grievance against his employer. None of the three *Connick* considerations—content, context and form—supports a finding that this email commented upon a matter of public concern.

### c. Funding emails

Finally, Plaintiff asserts that he sent several emails that commented on KSU's management of funds. (Docs. 34-42, 34-43, 34-44.) These emails make reference to Plaintiff's belief that Lefton was overpaid while KSU's rankings were dropping (Doc. 34-43), his alleged ability to find better jobs at other institutions for fellow KSU employees (Doc. 34-42), and his assertion that his supervisors were depriving him of overtime. (Doc. 34-44.)

These emails do not inform the public of any mismanagement of funds or corruption by public officials that would constitute a matter of public concern. The Sixth Circuit's decision in *Barnes v. McDowell*, 848 F.2d 725 (6th Cir. 1988) favorably cited to a District of Columbia case, namely *Murray v. Gardner*, 741 F.2d 434 (D.C. Cir. 1984), on the issue of public funds and government efficiency. When a government employee claimed that her speech involved a matter of public concern because public monies and government efficiency were involved, the court concluded that "[i]f *Connick*'s rule could be bypassed by the [arguments that] public monies and government efficiency are

involved[,] *Connick* would stand for nothing." *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984); *see also Rahn v. Drake Center, Inc.*, 31 F.3d 407, 412 (6th Cir. 1994) ("the fact that [the plaintiff] believed that the money was not being spent in a wise fashion, by itself, is insufficient to find that [his speech] addressed a matter of public concern."). It is so in this case: The Court is simply unable to conclude from the emails Plaintiff has presented that any of his allegations or suggestions of poor financial management actually addressed issues of concern to the public, either within the KSU community or in the community at large.

### 2. Balancing Test

Having concluded that Plaintiff did not address matters of public concern in his emails, the Court does not need to consider the other elements of the retaliatory discharge test. *Banks*, 330 F.3d at 892-93 ("If a plaintiff's speech does not address a matter of public concern, no further inquiry is necessary.") Assuming, *arguendo*, however, that Plaintiff's speech did address matters of public concern, the Court will next apply the balancing test set forth in *Pickering*.

While the inquiry into whether a plaintiff's speech addressed matters of public concern is a question of law, the balancing of the employer's and employee's interests is a question of fact. *Bonnell v. Lorenzo*, 241 F.3d 800, 809-10 (6th Cir. 2001). The Court finds that no genuine issue of material fact exists regarding the balance of interests, and that the interests of Defendants in limiting Plaintiff's speech outweigh Plaintiff's interest in speaking.

The Sixth Circuit has held that, in conducting this balancing test, a Court should "consider whether an employee's comments meaningfully interfere with the

performance of [his] duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994) (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Stern v. Shouldice*, 706 F.2d 742, 748 (6th Cir. 1983)). Even speech on matters of public concern may be stopped by an employer if any "*potential* disruptiveness [is] enough to outweigh whatever First Amendment value the speech might have had." *Waters v. Churchill*, 511 U.S. 661, 680-81 (1994) (emphasis added).

The Court has already laid out the contents of Plaintiff's many emails to the KSU community, complete with name-calling, profanity, insults to supervisors and administrators, suggestions of threats, and rejections of orders and directives. Plaintiff asserts that he had an interest in speaking on matters of labor relations and fiscal responsibility at KSU. His emails, however, demonstrate that his interest was in making passing reference to issues generously characterized as ones of labor relations and the college's financial decisions, in a larger scheme of giving vent to his own personal frustrations with campus administration and his direct supervisors.

Defendant's interest was in maintaining a beneficial and productive email system for KSU's employees, and in maintaining order in its CE&O department. More specifically, Defendant's interest was in preventing the subjection of its employees—and particularly the named targets of Plaintiff's emails—to harassing emails replete with name-calling, insults, threats and other offensive content that caused workplace disruption and problems with employee morale. On a practical level, it was in Defendants' interest to prevent the transmission of these inappropriate emails that

19

employees would have received in their work email accounts during working hours (regardless of when Plaintiff sent them) and that had no relation to the employees' duties. Moreover, as already noted, Defendants do not need to prove that such disruption actually occurred; they need only show that it had the potential to occur, which it clearly did in this case. *Waters*, 511 U.S. at 673.

Plaintiff clearly stated in his emails that he had no respect for his employer, who attempted to give him multiple chances to amend his behavior. Instead, even when cautioned that further "threatening emails" sent "throughout the university community" should "immediately and permanently cease" or discipline would be imposed, Plaintiff continued the unprotected speech that Defendants attempted to curb. (Doc. 29-36.) In fact, the behavior not only continued, it intensified. For these reasons, the Court finds that, to the extent that one could even find that the matters may have been of public concern, any interest Plaintiff might have had in commenting on said matters would be outweighed by Defendants' interests in maintaining a workplace free of hostility and in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

### 3. Reason for Termination

The third element of the retaliation analysis requires the Court to consider whether protected speech formed the basis for Plaintiff's termination. As the Court has concluded that Plaintiff has neither demonstrated that he spoke on a matter of public concern nor, even if he had, that his interests in such speech outweighed the interests of Defendants in curbing his speech, it finds that it does not need to examine the basis for Plaintiff's termination. *Bonnell*, 241 F.3d at 810 (citing *Connick*, 461 U.S. at 146).

20

**C. Immunity**

To the extent that Plaintiff's Complaint seeks damages under 28 U.S.C. § 1983 from KSU and the individually-named defendants acting in their official capacities, Defendants have asserted immunity under the Eleventh Amendment. Plaintiff states that he does not seek damages from either KSU or the individually-named defendants in their official capacities. Notwithstanding Plaintiff's "clarification" in his opposition brief of the damages he seeks, the Court shall next address this issue.

KSU (a state institution pursuant to O.R.C. §§ 3345.011 and 2743.01(A)) and the individually-named defendants acting in their official capacities would be immune from any such claim for damages. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65-71 (1989) ("a State is not a 'person' within the meaning of § 1983," and suits against state officials sued in their official capacities are simply suits against the state.). Even if they were not immune, Plaintiff has failed to assert any successful claim against them.

The individually-named defendants also assert qualified immunity in response to Plaintiff's claims against them in their individual capacities. Qualified immunity shields from liability government officials performing discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It requires a two-part analysis. First, a court must determine whether, viewing the facts in the light most favorable to the party asserting the injury, the plaintiff has alleged a deprivation of a constitutionally protected right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If so, "then the second step is to determine whether the right is so

21

'clearly established' that a 'reasonable official would understand that what he is doing violates that right.'" *Brennan v. Township of Northville*, 78 F.3d 1152, 1154 (6th Cir. 1996) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Throughout the analysis, the burden is on the plaintiff to show that defendants are not entitled to qualified immunity. *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006).

Plaintiff has failed to demonstrate that he was engaged in protected conduct, and therefore cannot show that he was deprived of a constitutionally protected right. *See Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 967 (6th Cir. 2002). Therefore, Defendants in their individual capacities are entitled to qualified immunity. *Id.*

## IV. Conclusion

For the reasons set forth herein, the motion of Defendants for summary judgment (Doc. No. 35) is GRANTED.

**IT IS SO ORDERED**.

Dated: March 31, 2011

_____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**